LOAN NO.: 39197

# LOAN AGREEMENT

THIS LOAN AGREEMENT is made and entered into this 28th day of October, 2015, by and between **Wald Wood Products, Inc.** (hereinafter referred to as the "Borrower") and **Entegra Bank** ("Lender").

## W I T N E S S E T H:

WHEREAS, Borrower desires financing for the refinance of business debt, working capital and the refinance of certain commercial real estate more particularly described herein; and

WHEREAS, of even date herewith, Lender and Borrower entered into that certain loan guaranteed by the U.S. Small Business Administration (the "SBA") evidenced by the SBA Note wherein the Lender agreed to provide a loan (the "Loan") to Borrower for up to ONE MILLION THREE HUNDRED SIXTY-NINE THOUSAND AND NO/100 DOLLARS ($1,369,000.00) for the aforementioned purpose; and

WHEREAS, in order to loan funds to Borrower, Lender enters into this Loan Agreement with Borrower for the purposes herein contained; and

WHEREAS, the loan made hereunder will be secured in part by first position liens on certain real property pledged to Lender, more particularly described herein a first position security interest in the business assets of the Borrower, now owned or hereafter acquired and wherever located.

NOW, THEREFORE, for and in consideration of the premises, the sum of Ten ($10.00) Dollars and other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## ARTICLE I
## AMOUNT AND TERMS OF LOAN

1.1     RECITALS.  Each of the above recitals are hereby incorporated into and made a part of this Agreement by this reference.

1.2     LOAN AND NOTE.  The term "Loan" herein shall refer to the indebtedness of Borrower to Lender evidenced by a Note in the original principal amount of ONE MILLION THREE HUNDRED SIXTY-NINE THOUSAND AND NO/100 DOLLARS ($1,369,000.00) in form satisfactory to Lender (the "Note").

## ARTICLE II
## CONDITION OF LENDING

2.1     CONDITIONS PRECEDENT TO THE LOAN.  As a condition precedent to Lender making the Loan, the Borrower and/or **THOMAS C. WALD** and **KAREN R. WALD** (each jointly, severally, collectively and sometimes interchangeably referred to herein as the "Guarantor") shall deliver to Lender on or before the date of the Loan closing, the following, in form and substance satisfactory to Lender:

(a)     The Note;

- 1 -

Exhibit 1

    (b)      The Mortgage;

    (c)      The Security Agreement;

    (d)      UCC-1 Financing Statement;

    (e)      Evidence satisfactory to Lender of ownership of the Collateral by Borrower free and clear of encumbrances of any kind not specifically referenced in this Agreement;

    (f)      The Assignment of Leases and Rents;

    (g)      The Guarantee Agreements; and

    (h)      Such other documents as reasonably may be required by the Lender or Lender's counsel.

The Loan documents as provided above (collectively, the "Loan Documents"), when prepared, shall set forth the matters contained in the Loan Agreement and contain such other provisions as are deemed necessary or desirable by Lender. The form and substance of all such documents must be satisfactory to Lender prior to disbursement by Lender of any of the proceeds of the Loan.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF BORROWER

The Borrower represents and warrants to, and agrees with the Lender as follows:

3.1    POWER AND AUTHORIZATION.

    (a)      Borrower's execution, delivery, and performance of this Agreement and all the Loan Documents have been duly authorized by all necessary action by Borrower and do not conflict with, result in a violation of, or constitute a default under (1) any provision of (a) Borrower's articles of incorporation or organization, or bylaws, or (b) any agreement or other instrument binding upon Borrower or (2) any law, governmental regulation, court decree, or order applicable to Borrower or to Borrower's properties.

    (b)      This Agreement constitutes, and any instrument or agreement Borrower is required to give under this Agreement when delivered will constitute legal, valid, and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms.

3.2    FINANCIAL CONDITION.   The reports and financial statements of Borrower and Guarantor submitted to Lender in connection with the Loan have been prepared from Borrower's or Guarantor's books and records in accordance with generally accepted accounting principles and practices, consistently applied, and fairly reflect the financial condition of Borrower and Guarantor for the periods therein defined. No material adverse changes have since occurred.

Except as disclosed in the aforesaid reports and financial statements, Borrower:

    (a)      Has not incurred any debts, liabilities or other obligations nor committed to incur any debts, liabilities or obligations;

    (b)      Has no liabilities, direct or contingent;

(c)     Has made no investments in, advances to, or guaranties or obligations of any other company, person, firm, corporation, or other entity;

(d)     Is not subject to any judgment, nor are there any liens, encumbrances or security interests outstanding against Borrower or any of its properties.

3.3     LITIGATION. There is no litigation, proceeding, claim, dispute, action, judgment, bankruptcy or execution pending or threatened against Borrower, the Loan Documents, Guarantor, or the any real property pledged as Collateral, the adverse determination of which would materially affect: Borrower's ability to repay the loan, any real property pledged as Collateral, the Business Assets (herein defined), or otherwise materially affect the Borrower or Guarantor's ability to perform hereunder.

3.4     INDEBTEDNESS GUARANTEED. The indebtedness guaranteed under this Loan includes any and all of Borrower's liabilities, obligations and debts to Lender, now existing or hereinafter incurred or created, including, without limitation, all loans, advances, interest, costs, debts, overdraft indebtedness, and all other obligations and liabilities of Borrower, and any present or future judgments against Borrower; and whether any such indebtedness is voluntarily or involuntarily incurred, absolute or contingent, liquidated or unliquidated, determined or undetermined; whether Borrower may be liable individually or jointly with others, or primarily or secondarily, or as guarantor or surety; whether recovery on the indebtedness may be or may become barred or unenforceable against Borrower for any reason whatsoever; and whether the indebtedness arises from transactions which may be voidable on account of infancy, insanity, ultra vires, or otherwise.

### ARTICLE IV
### COVENANTS BY BORROWER

Until all the obligations of Borrower under this Agreement have been performed and paid in full, Borrower covenants and agrees as follows:

4.1     INSURANCE. Borrower shall maintain or require Guarantor to maintain insurance on the Collateral (hereinafter defined) as described in Article VII hereof in such amounts and against such hazards and liabilities as is customarily maintained by other companies in the same geographical area operating similar businesses or as may be otherwise requested by the Lender. All such policies of insurance shall be in form and substance and with insurance companies satisfactory to Lender, and Borrower shall deliver evidence thereof to Lender upon request. Further, upon request, Lender shall be designated as loss payee or as mortgagee under any such policies, as its interests may appear.

4.2     LIFE INSURANCE. Borrower shall maintain or require Guarantor to maintain life insurance on any individual and in such amounts so designated by Lender and/or SBA in their sole and absolute discretion. All such life insurance policies shall be in form and substance and with insurance companies satisfactory to Lender, and Borrower shall deliver evidence thereof to Lender upon request. Further, Borrower and/or Guarantor, as applicable, covenant and agree to maintain the life insurance in good standing throughout the term of Lender's loan. Failure to do so shall constitute an event of default hereunder and shall entitle Lender to any and all remedies upon default described herein.

4.3     MAINTENANCE OF BUSINESS AND CORPORATE EXISTENCE. Borrower shall comply with all valid and applicable statutes, ordinances, rules and regulations and shall keep in force and effect all licenses, permits, bonds and franchises necessary for the proper conduct of its business.

4.4     ADVERSE CHANGES AND LITIGATION. Borrower shall immediately inform Lender of any material adverse change in its financial condition, or the financial condition of Guarantor, and shall promptly inform Lender of any litigation or threatened litigation or of the occurrence of any

other event or circumstance which might substantially affect the financial condition or business of Borrower or Guarantor.

4.5     MANAGEMENT AND OWNERSHIP. No material change shall be made, without the prior written consent of Lender, in the management or ownership of Borrower, or Guarantor, as applicable, or in the manner in which its business is conducted. Said consent may be conditioned upon the pledge of additional collateral or supplemental guarantees. Further, in the event of a change in ownership in the Borrower or Guarantor resulting in an increase to or new ownership stake equal to or greater than twenty percent (20%), such individual, entity or otherwise will, within thirty (30) days of the change in ownership, execute all paperwork necessary to effectuate an unlimited guaranty of the Loan. Failure to provide such guaranty within 30 days of the change in ownership will constitute an Event of Default as defined herein and shall entitle Lender to all necessary and appropriate remedies hereunder.

4.6     FINANCIAL STATEMENTS. Borrower and Guarantor shall furnish Lender with the following:

   (a)   Annual Statements.  As soon as available, but in no event later than one-hundred-twenty (120) days after the end of each fiscal year, Borrower and Guarantor's balance sheets and profit and loss statements, all in reasonable detail.

   (b)   Tax Returns.  As soon as available, but in no event later than one-hundred-twenty (120) days after the applicable filing date for the tax reporting period ended, Federal and other governmental tax returns.

   (c)   Property Taxes.  Borrower shall also furnish evidence of payment of real estate taxes on the real properties pledged as Collateral to Lender on an annual basis.

   (d)   Such other or additional financial information as Lender may from time to time request.  Nothing contained herein shall be deemed to limit Lender in any future requests for more detailed financial statements from Borrower or Guarantor.

All financial reports required to be provided under this Agreement shall be prepared by a certified public accountant or accountants acceptable to Lender, certified by a duly authorized officer of Borrower and/or Guarantor to be correct and accurate, and prepared in accordance with generally accepted accounting principles, applied on a consistent basis. At Bank's sole discretion, Borrower and Guarantor will be subject to a $50.00 per day financial penalty for failure to provide the required financial statements within 10 days following the applicable due date.

4.7     OTHER DEBTS. The Borrower shall not directly or indirectly incur, create, assume or permit to exist any obligation for payment of borrowed money, excepting only unsecured current liabilities incurred in the ordinary course of business and obligations contemplated by this Agreement, without the express written consent of Lender, which consent shall not be unreasonably withheld. Further, Borrower shall not guarantee the obligations of any person or entity, excepting only obligations contemplated by this Agreement.

4.8     SALE OF COLLATERAL. Borrower shall not sell, lease, transfer or otherwise dispose of any of the Collateral as described in ARTICLE VII hereof, other than in the ordinary course of Borrower's business. If Borrower should desire to sell any of the Collateral, a release price therefor will be determined at the sole discretion of Lender, and upon the sale of that Collateral, the release price will be paid over by Borrower to Lender and applied by Lender to payments due on the Note, in inverse order of the due dates, and Lender shall thereupon release its lien or security interest upon the Collateral sold.

4.9     BULK SALE. The Borrower shall not, without the prior written consent of the Lender, sell, transfer or convey all or any part of its interest in its assets to another entity.

- 4 -

4.10     ENCUMBRANCES.  Borrower shall not incur or permit to exist, nor allow Guarantor to incur or permit to exist any encumbrance, pledge or lien upon or against any of the Collateral, except:

(a)     Liens or security interests required or expressly contemplated or permitted by this Agreement;

(b)     Liens for taxes, assessments and other governmental charges not yet due and liens of carriers, warehousemen, mechanics and materialmen incurred in the ordinary course of business for sums not yet due; and

(c)     Tax liens which are being contested in good faith.

4.11     LIEN PRIORITY OF BORROWER.  That Borrower is pledging to secure the Loan that certain personal property (the "Business Assets") described in Exhibit "A" attached hereto and by this reference incorporated herein.  Unless otherwise previously disclosed to Lender in writing, Borrower has not entered into or granted any Security Agreements, or permitted the filing or attachment of any security interests on or affecting any of the Business Assets directly or indirectly securing repayment of Borrower's Loan and Note, that would be prior or that may in any way be superior to Lender's security interests and rights in and to such Business Assets except as set forth on Exhibit "B" attached hereto and by this reference incorporated herein.

4.12     TAXES.   Borrower shall pay promptly, when due, all taxes, assessments and governmental charges or levies imposed upon the Borrower or upon the income or any property of the Borrower, as well as all claims of any kind (including claims for labor, material, supplies or rent) which, if unpaid, might become a lien upon any or all of the Collateral.

4.13     EXAMINATION OF RECORDS.  Borrower shall permit any representative of Lender to examine and to audit any or all of Borrower's books and records and to copy portions thereof, and to visit and inspect any of the Collateral upon receipt of reasonable notification and request.

4.14     ENVIRONMENTAL MATTERS.

(a)     Any and all real property or interests in real property pledged as collateral security for the Loan, are free of any substantial amounts of waste or debris, and are free from any material amounts of contamination, including:

(1)     "Any Hazardous Waste," as defined by the Resource Conservation and Recovery Act of 1976 or any "Hazardous Substance" as defined in Arkansas law, as applicable, both as amended from time to time, and regulations promulgated thereunder;

(2)     "Any Hazardous Substance" as defined by the Comprehensive Environmental Response, Compensation and Liability Act of 1989, as amended from time to time, and regulations promulgated thereunder;

(3)     Any substance, the presence of which on the real property is prohibited by any law similar to those set forth in this section; and

(4)     Any material which, under federal, state or local law, statute, ordinance or regulation, or court administrative order or decree, or private agreement, requires special handling in collection, storage, treatment or disposal.

(b)     Borrower has not filed any notice under any federal or state law indicating past or present treatment, storage or disposal of a hazardous waste, substance or constituent, or other

- 5 -



substance into the environment. None of the operations of Borrower is the subject of federal or state litigation or proceedings, or of any investigation evaluating whether any remedial action involving a material expenditure is needed to respond to any improper treatment, storage, recycling, disposal or release into the environment of any hazardous or toxic substance, waste or constituent. None of the operations of Borrower is subject to any judicial or administrative proceeding alleging the violation of any federal, state or local environmental, health or safety statute or regulation. Borrower does not transport any hazardous wastes, substances or constituents.

(c)     All notices, permits, licenses or similar authorizations, if any, required to be obtained or filed in connection with the operation or use of any and all real property pledged as collateral security for the Loan, including, without limitation, past or present treatment, storage, disposal or release of a hazardous substance or solid waste into the environment, have been, to the knowledge of the Borrower, duly obtained or filed.

(d)     Borrower will take and continue to take prompt action to remedy all environmental pollution and contamination, hazardous waste disposal and other environmental clean-up problems, if any, whether or not such clean-up problems have resulted from the order or request of a municipal, state, federal, administrative or judicial authority, or otherwise. Borrower will not violate any applicable municipal ordinance, state or federal statute, administrative rule or regulation, or order or judgment of any court with respect to environmental pollution or contamination, hazardous waste disposal or any other environmental matter.

(e)     Borrower will indemnify and hold Lender, its officers, directors, employees, representatives, agents, and affiliates harmless against, and promptly pay on demand or reimburse each of them with respect to, any and all claims, demands, causes of action, loss, damage, liabilities, costs and expenses of any and every kind or nature whatsoever asserted against or incurred by any of them by reason of or arising out of or in any way related to (a) the breach of any representation or warranty as set forth herein regarding Environmental Laws, or (b) the failure of Borrower to perform any obligation herein required to be performed pursuant to Environmental Laws. The provisions of this section shall survive the final payment of the Loan and the termination of this Agreement, and shall continue thereafter in full force and effect.

(f)     Notwithstanding anything contained in herein to the contrary, any covenants of Borrower concerning any environmental matter addressed herein shall not be applicable to any condition which is first created or introduced after a foreclosure, conveyance or other transfer of title of the real property pledged as collateral security for the Loan.

4.15     BUSINESS PURPOSE. The Borrower and Guarantor hereby certify that the proceeds of the Loan will be used solely for business or commercial purposes and not for personal, family or household use. Borrower and Guarantor acknowledge that Lender is relying on this provision in deeming the subject loan transaction exempt from any and all provisions and disclosure requirements under the Federal Consumer Protection Act (Truth-in-Lending Act), Regulation "Z", the Home Mortgage Disclosure Act, and the Real Estate Settlement Procedures Act.

### ARTICLE V
### EVENTS OF DEFAULT

The occurrence of any one or more of the following shall constitute an "Event of Default":

(a)     Nonpayment, when due, of any principal, accrued interest, premium, fee or other charge due under the Note.



(b)      Default by Borrower in the due observance or performance of any term, covenant, condition or agreement on its part to be performed under this Loan Agreement, the Note, or under any other document contemplated by this Loan Agreement.

(c)      If Borrower shall:

(1)      Make a general assignment for the benefit of its creditors;

(2)      File a voluntary petition in bankruptcy;

(3)      Be adjudicated as bankrupt or insolvent;

(4)      File any petition or answer seeking, consenting to, or acquiescing in, reorganization, arrangement, composition, liquidation, dissolution or similar relief, under any present or future statute, law or regulation;

(5)      File an answer admitting or failing to deny the material allegations of the petition against it for any such relief;

(6)      Admit in writing its inability to pay its debts as they mature;

(7)      Discontinue business; or

(8)      Be unable to pay debts as they become due.

(9)      Become the subject of a proceeding under any bankruptcy or insolvency law; or

(10)     Have a receiver or liquidator appointed for any part of the Borrower's business or property.

(d)      Borrower fails to have vacated or set aside within thirty (30) days of its entry any court order appointing a receiver or trustee for all or a substantial portion of the Borrower's property.

(e)      Any warranty, representation or statements made or furnished to Lender by Borrower in connection with the Loan or in connection with this Agreement (including any warranty, representation or statement in the application of Borrower for the Loan or in any accompanying financial statements) or to induce Lender to make the Loan, proves to be untrue, misleading or false in any material respect.

(f)      Borrower suffers or permits any lien, encumbrance or security interest to attach to any of its property, except as herein otherwise expressly permitted, or if any judgment shall be entered against Borrower or any attachment shall be made against any property of Borrower, which judgment or attachment shall remain undischarged, unbonded, or undismissed for a period of ten (10) days.

(g)      Borrower or any Guarantor defaults in the payment of any principal or interest on any obligation to Lender or to any other creditor.

(h)      Borrower shall sell, lease, or otherwise transfer or convey any of the Collateral, or any interest therein without Lender's prior written approval, except as herein otherwise expressly permitted.

- 7 -



(i)     This Agreement or any of the Loan Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

(j)     A material adverse change occurs in Borrower's or Guarantor's financial condition, or Lender believes the prospect of payment or performance of the Loan is impaired.

(k)     Failure by any individual, entity or otherwise owning twenty percent (20%) or more of the Borrower or Guarantor to provide an unlimited guaranty for the Loan, regardless of whether such ownership exists prior to or subsequent to the date hereof.

(l)     Failure to comply with Lender or Lender's counsel's requests as they may relate to the SBA Authorization, Loan Documents, or any other requests by and on behalf of the SBA or any of its agents and representatives.

(m)     The death or incapacity of any Guarantor to the Loan.   Furthermore, the Guarantee Agreements and all covenants contained therein shall bind Guarantor's estate as to the Indebtedness created both before and after Guarantor's death or incapacity, regardless of Lender's actual notice of Guarantor's death or incapacity.

(n)     Borrower or Guarantor fails to preserve, or account to Lender's satisfaction for, any of the Collateral or its proceeds.

(o)     Failure by Borrower or Guarantor to pay taxes when due.

(p)     The reorganization, merger, consolidation or other change in the Borrower or any entity Guarantor's business structure without Lender's prior written consent.

(q)     Borrower or any Guarantor becomes the subject of a civil or criminal action that Lender believes may materially affect Borrower's ability to pay the Loan.

(r)     Borrower or Guarantor fail to maintain life insurance in good standing on any individual so required by Lender and/or SBA and in such amounts as required by Lender and/or SBA in their sole and absolute discretion for the full term of the Loan.

### ARTICLE VI
### REMEDIES ON EVENT OF DEFAULT

6.1     DECLARE NOTE DUE.   Upon the occurrence of any Event of Default as defined in this Agreement, the Note, the Mortgage, or any other document contemplated by this Agreement, then in any such event, Lender at its option, may declare the entire unpaid balance of the Note to be forthwith due and payable, and thereupon such balance shall become so due and payable without presentment, protest or further demand or notice of any kind, all of which are hereby expressly waived, and Borrower will forthwith pay to Lender the entire principal of and interest accrued on the Note

6.2     OTHER REMEDIES.   Upon the occurrence or discovery of an Event of Default, the Lender shall, in addition to its option to declare the entire unpaid amount of the Note due and payable, at its option:

(a)     Move to protect its rights and remedies as a secured party under the Mortgage or any other instrument, by extrajudicial authority as set forth in those instruments, by action at law or equity, or by any other lawful remedy to enforce payment.



(b)     Apply the proceeds from any disposition of the Collateral to the satisfaction of the following items in the order in which they are listed:

(1)     The expenses of taking, preserving, insuring, repairing, holding and selling the Collateral, including any legal costs and attorney's fees.  If any of the Notes shall be referred to an attorney for collection, Borrower and all others liable on the Note, jointly and severally agree to pay reasonable attorney's fees and all costs of collection.

(2)     The unpaid amount of any interest due on the Note, and all other expenses of Lender.

(3)     The unpaid principal amounts of the Note.

(4)     Any other indebtedness of Borrower to Lender.

(5)     The remainder, if any, to Borrower, it being understood and agreed that if the proceeds realized from the disposition of the Collateral shall fail to satisfy items (1) through (4) above, Borrower shall forthwith pay any such deficiency to Lender upon demand.

(c)     To the extent permissible under applicable law, Lender reserves a right of setoff in all accounts, funds, or property of any kind, tangible or intangible, held with Lender or pledged as collateral and held by a separate institution, belonging to Borrower.  This includes all accounts Borrower may open in the future.  Borrower authorizes Lender, to the extent permissible under applicable law, to charge or setoff all sums owing on the Loan against any and all such accounts without presentment, protest or further demand or notice of any kind, all of which are hereby expressly waived.

(d)     When any event occurs that Lender determines may endanger the fulfillment of any condition or covenant in this Agreement, or upon Default, Lender may require Borrower to furnish, within ten (10) days after delivery of a written request, adequate security to eliminate, reduce, or indemnify Lender against, such danger.  In addition, upon such occurrence, Lender in its sole discretion may advance funds or agree to undertake to advance funds to any party to eliminate, reduce, or indemnify Lender against, such danger.  All sums paid by Lender pursuant to such agreements or undertakings shall be for Borrower's account and shall be without prejudice to Borrower's rights, if any, to receive such funds from the party to whom paid.  All sums expended by Lender in the exercise of its option to protect Lender's interests shall be payable to Lender on demand together with interest from the date of the Advance at the rate applicable to the Loan.  In addition, any Advance of funds under this Agreement, including without limitation direct disbursements to the General Contractor, as applicable, or any other party in payment of sums due on the Borrower's behalf, shall be deemed to have been expended by or on behalf of Borrower and to have been secured by Lender's Mortgage, if any, on the Collateral as defined herein.

### ARTICLE VII
### COLLATERAL

Borrower's obligation for payment of the Note shall be collateralized by the following (the "Collateral"):

7.1     MORTGAGE.   A first Mortgage on the residential property located at 2539 E. Pevehouse Road, Van Buren, Arkansas 72956, more particularly described in Exhibit "C" attached hereto and by this reference made a part hereof; and

7.2     MORTGAGE.   A first Mortgage on the commercial property located at 2601 E. Pevehouse Road, Van Buren, Arkansas 72956, more particularly described in Exhibit "D" attached hereto and by this reference made a part hereof; and

7.3     MORTGAGE.   A first Mortgage on the commercial property located at 2204 East Walnut Street, Paris, AR 72855, more particularly described in Exhibit "E" attached hereto and by this reference made a part hereof; and

7.4     MORTGAGE.   A first Mortgage on the vacant land located on Highway 22, Paris, Arkansas, more particularly described in Exhibit "F" attached hereto and by this reference made a part hereof; and

7.5     MORTGAGE.   A first Mortgage on the residential property located at 1985 Thompson Bay Loop, Scranton, Arkansas 72863, more particularly described in Exhibit "G" attached hereto and by this reference made a part hereof; and

7.6     UCC FINANCING STATEMENT. A first security interest on all Borrower's goods, equipment, furniture, fixtures, inventory, accounts, accounts receivable, instruments, proceeds, chattel, paper, and general intangibles now owned or hereafter acquired and wherever located.

7.7     ASSIGNMENT OF LIFE INSURANCE. A life insurance policy on the life of Thomas C. Wald in the amount of $500,000.00, pledged by Thomas C. Wald to Lender.

7.8     ASSIGNMENT OF LIFE INSURANCE. A life insurance policy on the life of Karen R. Wald in the amount of $500,000.00, pledged by Karen R. Wald to Lender.

## ARTICLE VIII
## MISCELLANEOUS

8.1     CLOSING.   The Lender shall not be obligated to make the Loan or advance any funds until Borrower has fully met all requirements herein set forth to be met by Borrower, and until Borrower has paid to Lender and any other parties entitled thereto, all fees and other charges due in connection with the Loan.

8.2     AMENDMENTS.   No amendment of any provisions of this Loan Agreement, nor consent to any departure of Borrower therefrom, shall in any event be effective unless the same shall be in writing and signed by Lender and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

8.3     NOTICES.   Any and all notices, elections, demands, requests and responses thereto permitted or required to be given under this Agreement shall be in writing, signed by or on behalf of the party giving the same, and shall be deemed to have been properly given and shall be effective upon being personally delivered, or upon being deposited in the United States mail, postage prepaid, certified with return receipt requested (the delivery date being the date of the confirmed return receipt requested), or upon being deposited with an overnight commercial delivery service requiring proof of delivery, to the other party or parties at the address of such other party or parties set forth below or at such other address within the continental United States as such other party or parties may designate by notice specifically designated as a notice of change of address and given in accordance herewith; provided, however, that the time period in which a response to any such notice, election, demand or request must be given shall commence on the date of receipt thereof; and provided further that no notice of change of address shall be effective until the date of receipt thereof.  Personal delivery to a party or to any officer, partner, agent

- 10 -



or employee of such party at said address shall constitute receipt. Rejection or other refusal to accept or inability to deliver because of changed address of which no notice has been received shall also constitute receipt. Any such notice, election, demand, request or response, if given to Lender, shall be addressed as follows:

If to Borrower:

Wald Wood Products, Inc.
2204 East Walnut Street
Paris, Arkansas 72855

If to Lender:

Entegra Bank
14 One Center Court
Franklin, North Carolina 28734

8.4   GOVERNING LAW AND PARTIES BOUND.  This Agreement will be governed by, construed and enforced in accordance with federal law and the laws of the State of North Carolina, except and only to the extent of procedural matters related to the perfection and enforcement of Lender's rights and remedies against the real properties which matters shall be governed by the laws of the State of Arkansas. However, in the event that the enforceability or validity of any provision of this Agreement is challenged or questioned, such provision shall be governed by whichever applicable state or federal law would uphold or would enforce such challenged or questioned provision. The loan transaction which is evidenced by the Note and this Agreement has been applied for, considered, approved and made, and all necessary loan documents have been accepted by Lender in the State of North Carolina.

8.5   ATTORNEY'S FEES AND EXPENSES.  If Lender shall incur any cost or expense, including, without limitation, reasonable attorney's fees, in connection with this Agreement, the Note or the Loan, in any manner whatsoever, direct or indirect, whether with regard to the collection of amounts due, protection of Collateral, defense of Lender or otherwise, upon demand by Lender, Borrower shall pay the same or shall reimburse Lender therefor in full.

8.6   ASSIGNMENT BY BORROWER.  No commitment issued by Lender to Borrower for the Loan, nor any of Borrower's rights hereunder, shall be assignable by Borrower without the prior written consent of Lender.

8.7   NO WAIVER: REMEDIES.  No failure on the part of the Lender, and no delay in exercising any right under this Loan Agreement, shall operate as a waiver thereof; nor shall any single or partial exercise of any right under this Loan Agreement preclude any other or further exercise thereof or the exercise of any other right.

8.8   SEVERABILITY.  In the event that any clause or provisions of this Loan Agreement or any document or instrument contemplated by this Agreement shall be held to be invalid by any court of competent jurisdiction, the invalidity of such clause or provision shall not affect any of the remaining portions or provisions of this Loan Agreement.

8.9   TIME.  Time is of the essence of this Agreement.

8.10   ENTIRE AGREEMENT. This Agreement contains the entire agreement between Borrower, Lender and each Guarantor and supersedes all prior or contemporaneous agreements, understandings, representations, negotiations, discussions, and statements, either oral or written, express

or implied, relative to the matters which are the subject of this Agreement. The parties hereto acknowledge that no representations, inducements, promises, agreements or warranties, oral or otherwise, have been made by any party hereto or anyone acting on their behalf, which are not embodied in this Agreement.

8.11    EXHIBITS. All exhibits referred to in and attached to this Agreement are a part of this Agreement.

8.12    CAPTIONS. Captions in this Agreement are asserted for convenience of reference only and do not define, describe, or limit the scope or the intent of this Agreement or any of the terms of this Agreement.

8.13    FURTHER ASSURANCES. The parties shall cooperate with each other and execute any documents reasonably necessary to carry out the intent and purpose of this Agreement.

8.14    SBA LOAN. SBA has authorized a guaranty of a loan from Lender to Borrower for the amount and under the terms stated in the attached Authorization. In consideration of the promises in this Agreement and for other good and valuable consideration, Borrower and Lender agree as follows: Subject to the terms and conditions of the Authorization and SBA Participating Lender Rules as defined in the Guarantee Agreement between Lender and SBA, Lender agrees to make the Loan if Borrower complies with the following provisions:

Borrower must:

    a.   Provide Lender with all certifications, documents or other information Lender is required by the Authorization to obtain from Borrower or any third party;

    b.   Execute a note and any other documents required by Lender; and

    c.   Do everything necessary for Lender to comply with the terms and conditions of the Authorization.

8.15    SUCCESSORS AND ASSIGNS. Whenever in this Agreement one of the Parties hereto is named or referred to, the heirs, executors, legal representatives, successors and assigns of such party shall be included and all covenants and agreements contained in this Agreement by or on behalf of the Borrower or by or on behalf of the Lender shall bind and inure to the benefit of their respective heirs, executors, legal representatives, successors and assigns, whether so expressed or not. Further, the terms and conditions hereof shall remain in full force and effect after the closing of the Loan.

8.16    JOINT AND SEVERAL LIABILITY. All of the obligations of the Borrower hereunder shall be joint and several obligations of each such person or entity.

8.17    CREDIT REPORTS. Lender has the unlimited right, in its sole discretion and at any time any balance is outstanding on the Loan, to order a credit report from any credit reporting agency regarding the borrower's credit history and/or any guarantor's credit history.

8.18    CONFIDENTIALITY. All parties jointly and severally agree that the terms and provisions of the promissory note evidencing the loan from the Lender to the Borrower (as guaranteed by the Guarantor(s) and secured by the collateral documents, if applicable) shall be deemed CONFIDENTIAL and shall not be disclosed by any party or their agents, employees, representatives, and/or assigns except to their respective attorneys, accountants, and any regulating authorities as necessary or as required by subpoena or legal process. The obligations imposed on the parties herein and herewith stated shall continue following the termination or payoff of the Loan.

**IN WITNESS WHEREOF**, the parties have executed this Loan Agreement as of the date first above written.

**BORROWER:**

**Wald Wood Products, Inc.**

By: _____
Thomas C. Wald, President

By: _____
Karen R. Wald, Secretary

**GUARANTOR:**

_____
Thomas C. Wald, Individually

_____
Karen R. Wald, Individually

**LENDER:**

**Entegra Bank**

By: _____
Authorized Signer

- 13 -

**BORROWER NOTARY:**

STATE OF ___Arkansas___

COUNTY OF ___Crawford___

On October 28, 2015, before me, _Steven K. Rice_ personally appeared **Thomas C. Wald**, the President of **Wald Wood Products, Inc.**, ~~personally known to me~~ (or proved to me on the basis of satisfactory evidence) to be the officer whose name is subscribed to the within instruments, and acknowledged to me that s/he executed the same in his/her authorized capacity as President of **Wald Wood Products, Inc.**, and that by his/her signature on the instruments the entity upon behalf of which the persons acted executed the instrument.

WITNESS my hand and official seal.

Signature _____

> STEVEN RICE
> Arkansas - Sebastian County
> Notary Public - Comm# 12394411
> My Commission Expires Jul 21, 2023

STATE OF ___Arkansas___

COUNTY OF ___Crawford___

On October 28, 2015, before me, _Steven K. Rice_ personally appeared **Karen R. Wald**, the Secretary of **Wald Wood Products, Inc.**, ~~personally known to me~~ (or proved to me on the basis of satisfactory evidence) to be the officer whose name is subscribed to the within instruments, and acknowledged to me that s/he executed the same in his/her authorized capacity as Secretary of **Wald Wood Products, Inc.**, and that by his/her signature on the instruments the entity upon behalf of which the persons acted executed the instrument.

WITNESS my hand and official seal.

Signature _____

**GUARANTOR NOTARY:**

> STEVEN RICE
> Arkansas - Sebastian County
> Notary Public - Comm# 12394411
> My Commission Expires Jul 21, 2023

STATE OF ___Arkansas___

COUNTY OF ___Crawford___

On October 28, 2015, before me, _Steven K. Rice_ personally appeared **Thomas C. Wald**, ~~personally known to me~~ (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instruments, and acknowledged to me that s/he executed the same, and that by his/her signature on the instruments executed the instruments.

WITNESS my hand and official seal.

Signature _____

> STEVEN RICE
> Arkansas - Sebastian County
> Notary Public - Comm# 12394411
> My Commission Expires Jul 21, 2023

- 14 -

STATE OF _Arkansas_

COUNTY OF _Crawford_

On October _28th_, 2015, before me, _Steven R Rice_ personally appeared **Karen R. Wald**, ~~personally known to me~~ (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instruments, and acknowledged to me that she executed the same, and that by his/her signature on the instruments executed the instruments.

WITNESS my hand and official seal.

Signature _____

> STEVEN RICE
> Arkansas - Sebastian County
> Notary Public - Comm# 12394411
> My Commission Expires Jul 21, 2023

**LENDER NOTARY:**

STATE OF _NC_

COUNTY OF _Macon_

On October _28th_, 2015, before me, _Melissa Carpenter_ personally appeared _Kimberly McClure_, the _First Vice President_ of **Entegra Bank,** personally known to me (or proved to me on the basis of satisfactory evidence) to be the officer whose name is subscribed to the within instruments, and acknowledged to me that s/he executed the same in his/her authorized capacity as _First Vice President_ of **Entegra Bank,** and that by his/her signature on the instruments the entities upon behalf of which the person acted executed the instruments.

WITNESS my hand and official seal.

Signature _Melissa Carpenter_
My Commission Expires: 02/01/20

> MELISSA CARPENTER
> NOTARY PUBLIC
> MACON COUNTY, NC

- 15 -

## EXHIBIT "A"

BUSINESS ASSETS DESCRIPTION

      All inventory, equipment, accounts (including but not limited to all health-care-insurance receivables), chattel paper, instruments (including but not limited to all promissory notes), letter-of-credit rights, letters of credit, documents, deposit accounts, investment property, money, other rights to payment and performance, and general intangibles (including but not limited to all software and all payment intangibles); all oil, gas and other minerals before extraction; all oil, gas, other minerals and accounts constituting as-extracted collateral; all fixtures; all timber to be cut; all attachments, accessions, accessories, fittings, increases, tools, parts, repairs, supplies, and commingled goods relating to the foregoing property, and all additions, replacements of and substitutions for all or any part of the foregoing property; all insurance refunds relating to the foregoing property; all good will relating to the foregoing property; all records and data and embedded software relating to the foregoing property, and all equipment, inventory and software to utilize, create, maintain and process any such records and data on electronic media; and all supporting obligations relating to the foregoing property; all whether now existing or hereafter arising, whether now owned or hereafter acquired or whether now or hereafter subject to any rights in the foregoing property; and all products and proceeds (including but not limited to all insurance payments) of or relating to the foregoing property.

- 16 -

## EXHIBIT "B"

### LIENS AFFECTING THE PROPERTY

1.  Security Agreement and UCC-1 in favor of Entegra Bank against business assets of Borrower.

**EXHIBIT "C"**
(Legal Description)


Part of the Northeast Quarter (NE ¼) of the Southeast Quarter (SE ¼) of Section 10, Township 9 North Range 32 West, Crawford County, Arkansas, Being more Particularly Described as follows: Commencing at an Existing Rebar marking the Northeast Corner of Said Northeast Quarter (NE ¼) of the Southeast (SE ¼) , Said point also marking the Northeast Corner of a previous 1.79 Acre Survey by RLS # 147, Job #21,107, Dated 2-13-1997; Thence N86°29'27"W, Along the North Line of said previous survey, 225.00' to a set mag nail at the Northwest corner of said previous survey also being the Point of Beginning; Thence S03°34'44"W for a distance of 78.74' to a set half inch rebar and cap stamped 1558 in the center of Foster Branch Creek; Thence continuing along said creek S47°48'53"W for a distance 257.49' to a set half inch rebar and cap stamped 1558; Thence leaving said creek N32°48'43"W for 135.93' to a set half inch rebar and cap; Thence N01°21'51"E for a distance of 153.59' to a set half inch rebar and cap set on the North side of Pevehouse Road, said point being in the North line of said Southeast Quarter (SE ¼); Thence S86°29'27"E for a distance of 266.21' to the Point of Beginning, Containing 1.10 acres more or less, subject to any road right-of-ways or easements of record.

Property Address: 2539 E. Pevehouse Road, Van Buren, AR 72956.

- 18 -

**EXHIBIT "D"**
(Legal Description)


Part of the Northeast Quarter (NE ¼) of the Southeast Quarter (SE ¼) of Section 10, Township 9 North Range 32 West, Crawford County, Arkansas, Being more Particularly Described as follows: Commencing at an Existing Rebar marking the Northeast Corner of Said Northeast Quarter (NE ¼) of the Southeast (SE ¼) , Said point also marking the Northeast Corner of a previous 1.79 Acre Survey by RLS # 147, Job #21,107, Dated 2-13-1997; Thence N86°29'27"W, Along the North Line of said previous survey, 491.21' to a set half inch rebar and cap on the North side of Pevehouse Road; Thence S01°21'51"W for a distance of 153.59' to a set half inch rebar and cap; Thence S32°48'43"E for a distance of 135.93' to a set rebar and cap in Foster Branch Creek; Thence along said creek S47°48'53"W for a distance of 20.00' to a set half inch rebar and cap stamped 1558; Thence continuing along said creek S12°22'16"W for a distance of 84.21' to a set half inch rebar and cap stamped 1558; Thence continuing along said creek S09°27'32"E for a distance of 156.20' to a set half inch rebar and cap stamped 1558; Thence continuing along said creek S32°39'48"W for a distance of 81.62' to a set half inch rebar and cap stamped 1558; Thence leaving said creek N85°11'43"W for a distance of 149.38' to a set half inch rebar and cap stamped 1558; Thence S22°43'23"W for a distance of 45.31' to a set half inch rebar and cap stamped 1558; Thence crossing said creek S02°52'56"W for a distance of 124.58' to a set half inch rebar and cap stamped 1558; Thence N62°53'35"W for a distance of 129.29' to a set half inch rebar and cap stamped 1558 in the center of said creek; Thence leaving said Foster Branch Creek N03°37'31"E for a distance of 696.24' to a set mag nail on the north side of Pevehouse Road, said point being on the North line of said Southeast Quarter (SE ¼); Thence S86°29'27"E for a distance of 225.35' to the Point of Beginning, containing 4.07 acres more or less subject to any road right-of-ways or easements of record.

Property Address: 2601 E. Pevehouse Road, Van Buren, AR 72956.

**EXHIBIT "E"**
(Legal Description)

**First Parcel:**

Beginning at the Northwest corner of the Southwest Quarter of the Northeast Quarter, thence South 2 degrees 0 minutes 00 seconds East 43.43 feet to the South right of way of Arkansas Highway #22, thence North 87 degrees 33 minutes 00 seconds East along said right of way 433.40 feet to the place of beginning, thence along an existing fence line South 2 degrees 09 minutes 50 seconds East 600 feet more or less, to point which is 642 feet South of the North line of the Southwest Quarter of the Northeast Quarter and also the Northwest corner of a tract of land conveyed to John L. Koch and Rose C. Koch by a deed recorded in Deed Book 66, page 78, thence in an Easterly direction along this boundary line 394.60 feet more or less, to the Southwest corner of a tract of land conveyed to John L. Koch and Rose C. Koch by deed recorded in Deed Book 72 page 142, thence in a Northerly direction along this boundary line for a distance of 600 feet more or less, to the South right of way line of State Highway #22, thence in a Westerly direction along the South right of way line 394.60 feet more or less, to the place of beginning, being a part of the Southwest Quarter of the Northeast Quarter of Section 12, Township 7 North, Range 26 West, containing 5.44 acres more or less. Subject to 1/2 of the mineral rights reserved in a Warranty Deed from Arkansas Valley Industries, Inc. to Garland L. Williams and Leona Mae Williams, dated January 29, 1965, and recorded in Deed Book 66, page 220 in the office of the Recorder for the Northern District of Logan County, Arkansas.

LESS AND EXCEPT: Two acres of even width located across the north boundary of the property described below, located in Logan County, Arkansas.

**Second Parcel:**

Two acres of even width located across the North boundary of the property described below, located in Logan County, Arkansas:  Beginning at the Northwest corner of the Southwest Quarter of the Northeast Quarter, thence South 2 degrees 0 minutes 00 seconds East 43.43 feet to the South right of way of Arkansas Highway #22, thence North 87 degrees 33 minutes 00 seconds East along said right of way 433.40 feet to the place of beginning, thence along an existing fence line South 2 degrees 09 minutes 50 seconds East 600 feet more or less, to a point which is 642 feet South of the North line of the Southwest Quarter of the Northeast Quarter and also the Northwest corner of a tract of land conveyed to John L. Koch and Rose C. Koch by a deed recorded in Deed Book 66, page 78, thence in an Easterly direction along this boundary line 394.60 feet more or less, to the Southwest corner of a tract of land conveyed to John L. Koch and Rose C. Koch by Deed recorded in Deed Book 72, page 142, thence in a Northerly direction along this boundary line for a distance of 600 feet more or less, to the South right of way line of State Highway #22, thence in a Westerly direction along the South right of way line 394.60 feet more or less, to the place of beginning, being a part of the Southwest Quarter of the Northeast Quarter of Section 12, Township 7 North, Range 26 West, containing 5.44 acres, more or less. Subject to 1/2 of the mineral rights reserved in a Warranty Deed from Arkansas Valley Industries, Inc. to Garland L. Williams and Leona Mae Williams, dated January 29, 1965, and recorded in Deed Book 66, page 220 in the office of the Recorder for the Northern District of Logan County, Arkansas.

Property Address: 2204 E. Walnut Street, Paris, AR 72855.

**EXHIBIT "F"**
(Legal Description)

All of Lots 1 and 2, Block 5, in Oak Grove Addition to the Town of Paris, Arkansas.

Property Address: Vacant Land on or near Highway 22, Paris, AR.

**EXHIBIT "G"**
(Legal Description)


A tract of land located in part of the Southwest Quarter of the Northeast Quarter of Section 28, Township 8 North, Range 23 West in Logan County, Arkansas being more particularly described as follows: Commencing at a found 1/2 inch rebar at the Northwest corner of the Northwest Quarter of the Northeast Quarter of said Section 28; thence South 01 degree 22 minutes 51 seconds West 2603.42 feet along the West line thereof; thence South 86 degrees 05 minutes 37 seconds East 860.13 feet to a set 1/2 inch rebar; thence North 13 degrees 59 minutes 24 seconds West 255.92 feet to a set 1/2 inch rebar the point of beginning; thence North 04 degrees 02 minutes 50 seconds East 320.90 feet to a set 1/2 inch rebar on the South line of Arkansas Valley Surveying Job No. 1540; thence South 34 degrees 38 minutes 34 seconds East 160.61 feet along said South line to a found 1/2 inch rebar; thence South 34 degrees 38 minutes 36 seconds East 170.26 feet along said South line to a found 1/2 inch rebar; thence South 22 degrees 56 minutes 19 seconds East 29.06 feet along said South line to a found 1/2 inch rebar; thence South 22 degrees 56 minutes 52 seconds East 101.04 feet along said South line to a set 1/2 inch rebar; thence North 74 degrees 37 minutes 12 seconds West 271.17 feet to the point of beginning and being subject to all easements of record and as shown on Arkansas River Valley Surveying Job No. 4702. as Tract D.

Property Address: 1985 Thompson Bay Loop, Scranton, AR 72863.